1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBERT C. MILES,

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

Defendant.

CASE NO.     C07-5060RBL-
KLS

REPORT AND
RECOMMENDATION

Noted for March 7, 2008

Plaintiff, Robert C. Miles, has brought this matter for judicial review of the denial of his

applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has

been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local

Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261

(1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the

following Report and Recommendation for the Honorable Ronald B. Leighton's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 47 years old.[1]  Tr. 27.  He has a high school education and past work

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

1  experience as a landscaping contractor, assisted living aide, auto repair parts assistant manager, vocational

2  rehabilitation supervisor, recycler driver, and apartment maintenance man. Tr. 18, 23, 79, 84, 104.

3          On April 9, 2003, plaintiff protectively filed applications for disability insurance and SSI benefits,

4  alleging disability as of March 1, 2003, due to anxiety and depression. Tr. 15, 66-68, 78, 570-72.  His

5  applications were denied initially and on reconsideration. Tr. 27-29, 39, 574, 579.  A hearing was held

6  before an administrative law judge ("ALJ") on January 19, 2006, at which plaintiff, represented by

7  counsel, appeared and testified, as did a lay witness and a vocational expert. Tr. 595-639.

8          On March 7, 2006, the ALJ issued a decision, determining plaintiff to be not disabled, finding

9  specifically in relevant part:

10    (1)    at step one of the sequential disability evaluation process,[2] plaintiff had not
              engaged in substantial gainful activity since his alleged onset date of disability;

11

12    (2)    at step two, plaintiff had "severe" impairments consisting of traumatic right
              knee chondromalacia, asthma, major depressive disorder, anxiety disorder,
              alcohol dependence/abuse, and marijuana abuse;

13

14    (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any
              of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

15    (4)    at step four, (i) when abusing substances, plaintiff had the residual functional
16            capacity to perform a narrow range of light work, along with certain other non-
              exertional limitations, which precluded him from performing his past relevant
17            work; (ii) when not abusing substances, plaintiff had the residual functional
              capacity to perform a wide range of sedentary and light work, with certain other
18            non-exertional limitations, which again precluded him from performing his past
              relevant work; and

19    (5)    at step five, (i) when abusing substances, there are no jobs existing in significant
20            numbers in the national economy that plaintiff would be capable of performing;
              and (ii) when not abusing substances, plaintiff was capable of performing other
21            jobs existing in significant numbers in the national economy.

22  Tr. 15-26.  Plaintiff's request for review was denied by the Appeals Council on November 27, 2006,

23  making the ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. § 404.981, § 416.1481.

24          On February 7, 2007,[3] plaintiff filed a complaint in this Court seeking review of the ALJ's

25          [2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See
26  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability
    determination is made at that step, and the sequential evaluation process ends. Id.

27          [3]As indicated herein, plaintiff's complaint was filed more than sixty days after the Appeals Council denied plaintiff's
28  request for review.  A party may obtain judicial review of the Commissioner's final decision by commencing a civil action in federal
    court "within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow."
    42 U.S.C. § 405(g); 20 C.F.R. § 404.981 (claimant may file action in federal court within 60 days after the date notice of the

REPORT AND RECOMMENDATION
Page - 2

decision. (Dkt. #1-#7).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

(a)  the ALJ erred in evaluating the medical opinion source evidence in the record concerning the effects of plaintiff's mental impairments;

(b)  the ALJ erred in finding plaintiff's psychotic disorder and/or schizoaffective disorder and his cognitive disorder to be not severe;

(c)  the ALJ failed to adequately determine whether plaintiff's mental impairments met or equaled the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03, 12.04 and 12.06;

(d)  the ALJ erred in assessing plaintiff's credibility;

(e)  the ALJ erred in evaluating the lay witness evidence in the record;

(f)  the ALJ erred in assessing plaintiff's residual functional capacity; and

(g)  the ALJ erred in finding plaintiff's substance abuse was material to a finding of disability.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision.  <u>Allen v. Heckler</u>, 749

Appeals Council's action is received); 20 C.F.R. § 404.982 (any party to Appeals Council's decision or denial of review may request time for filing action in federal court be extended).  This "sixty-day time limit is not jurisdictional, but is instead a statute of limitation which the Secretary may waive." <u>Banta v. Sullivan</u>, 925 F.2d 343, 345 (9th Cir. 1991).  As such, failure to file within the sixty-day time limit is an affirmative defense, which "is properly raised in a responsive pleading." <u>Vernon v. Heckler</u>, 811 F.2d 1274, 1278 (9th Cir. 1987) (citing Federal Rule of Civil Procedure 8(c)).  Because the Commissioner failed to raise the statute of limitations as an affirmative defense in her responsive pleading, the issue is waived, and the undersigned will deal with this matter on its merits.

1  F.2d 577, 579 (9th Cir. 1984).

2  I.      The ALJ Erred in Evaluating the Medical Opinion Source Evidence in the Record

3          The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

4  medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in

5  the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions

6  of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion

7  must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th

8  Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

9  inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

10 "falls within this responsibility." Id. at 603.

11         In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

12 supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

13 detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

14 thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the

15 evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences

16 from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

17         The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

18 either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

19 treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

20 and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However,

21 the ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler,

22 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only

23 explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d

24 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

25         In general, more weight is given to a treating physician's opinion than to the opinions of those who

26 do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

27 a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings"

28 or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

Plaintiff argues the ALJ was "so exercised by his conviction" that plaintiff had lied about his alcohol and drug use, that the ALJ "did not bother with any specific analysis" of the medical opinion source evidence in the record concerning the effects of his mental health impairments. (Dkt. #23, p. 12). While plaintiff's characterization of the ALJ's attitude toward his alcohol and drug use is overstated, the undersigned does agree the ALJ's evaluation of the above medical opinion source evidence is lacking. With respect to that evidence, the ALJ found in relevant part as follows:

> I have carefully considered the reports of treating, examining and non-examining medical sources, including the State agency (Disability Determination Services) doctors who provided opinions for initial and reconsideration determinations. . . . I have considered and generally credited the opinions reported by the State agency doctors, examining mental health physicians, and treatment sources regarding the affects [sic] of the claimant's mental impairments and combined impairments on his abilities to function. The assessments have been reported over a period of nearly six years and vary significantly regarding the degree [sic] psychiatric dysfunction reported. However, the seemingly conflicting reports can be reconciled when view [sic] in context of the claimant's substance dependence and abuse, and the impact of substance abuse on his mental impairment and ability to follow the prescribed medication regimen. The record as a whole reveals Mr. Miles has had periods of relative mental stability, with episodic periods of much poorer functioning. As I have explained in greater detail above, the record reveals his mental impairments are generally stable with mild to moderate symptoms when he follows the prescribed medical regimen and does not heavily abuse alcohol. Some of the reporting evaluators and treatment sources have uncritically accepted the claimant's false statements regarding his abstinence from alcohol or have otherwise been unaware of his substance dependence abuse. The reported opinions that the claimant has recently been incapable of sustaining competitive work activity are at least partially supported by the record and are credited in my Finding No. 5.[4] However, the opinions are not credited with regard to the impact of the claimant's alcohol dependence and abuse on the instability of his other mental impairments and resulting functional limitations.

Tr. 22.

---

[4]In Finding No. 5, the ALJ made the following findings regarding plaintiff's mental functional limitations: "Due to pain and side-effects of medications, he is restricted to simple, one to three step, job tasks. Due to chronic mild to moderate difficulties with social functioning, he is restricted to jobs involving no public interaction. When abusing alcohol or marijuana, and when he is not compliant with the prescribed medical regimen due to substance abuse, the claimant experiences greater difficulties with social and cognitive functioning, and is unable to regularly attend work or sustain and complete work tasks throughout a full-time workday or workweek." Tr. 21.

As can be seen, the ALJ makes no specific references in the above findings to any of the individual medical opinion sources in the record.  The ALJ did state that some of those sources uncritically accepted what he deemed to be plaintiff's untruthful statements regarding his abstinence from alcohol or that they were not aware of the extent of plaintiff's substance abuse dependence, both of which certainly can be legitimate reasons for rejecting a medical source opinion.  It is entirely unclear, however, exactly which sources the ALJ was discussing.  Without such specific references, the undersigned is unable to determine the validity of the reasons put forth by the ALJ as they apply to the facts of this case.

The undersigned, accordingly, finds that remand to the Commissioner for re-consideration of the medical opinion source evidence in the record concerning the effects of plaintiff's mental impairments is proper.  Plaintiff argues the ALJ was required to defer to the opinions of two medical sources who treated plaintiff soon after he was hospitalized in early March, 2003, due to complaints of chest pain and suicidal feeling. Tr. 343.  Both of those sources assessed plaintiff with very low global assessment of functioning ("GAF")[5] scores, which plaintiff argues indicates his symptoms have reached a disabling level of severity.  Plaintiff further argues that, contrary to the ALJ's views regarding his alcohol and drug use, neither these two sources, nor any of the other medical sources in the record, diagnosed him with any substance-induced psychiatric condition.  The undersigned disagrees.

One of the above medical sources whose opinion plaintiff asserts the ALJ should have adopted is that of Michael B. Willett, M.D., who evaluated plaintiff shortly after his release from the hospital on March 24, 2003.  Dr. Willett diagnosed plaintiff with a severe major depressive disorder, single episode, an anxiety disorder, and a GAF score of 45. Tr. 213-14.  The next day, Dr. Willett completed two checklist forms, in which he indicated plaintiff had "severe to disabling" psychiatric symptoms. Tr. 204-05.  Dr. Willett at this time diagnosed plaintiff with a recurrent, severe major depressive disorder without psychotic features, a panic disorder without agoraphobia, and again a GAF score of 45. Tr. 207-08.  In early April, 2003, Dr. Willett assessed plaintiff with a GAF score of 50, but, as of early May 2003, continued to feel he remained severely impaired due to his psychiatric symptoms and at risk for re-hospitalization without

---

[5]The global assessment of functioning "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 4th ed. 2000 (DSM-IV-TR) at 32).

1    treatment. Tr. 183, 186, 190-91, 193, 216.

2           The other medical source noted above is Dr. Stephen Stolzberg, who, in mid-April 2003, evaluated

3    plaintiff, and who diagnosed him with a panic disorder with agoraphobia, major depression, alcohol abuse,

4    canabis use, and a GAF score of 31. Tr. 175.  By late April 2003, however, plaintiff showed improvement,

5    with Dr. Stolzberg noting "minimal tremor," an okay mood, and no suicidal or homicidal plan or intent or

6    other specific concern with thought process and content. Tr. 170.  Dr. Stolzberg thus assessed him as being

7    "much improved" at the time. Id.

8           As noted above, plaintiff argues the low GAF scores assessed by Dr. Willett and Dr. Stolzberg are

9    indicative of a disabling level of symptomatology.  It is true that "[a] GAF score of 41-50 indicates

10   '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an

11   inability to keep a job." Pisciotta, 500 F.3d at 1076 n.1 (quoting DSM-IV-TR at 34); see also Cox v.

12   Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) ("[A] GAF score in the forties may be associated with a

13   serious impairment in occupational functioning."); England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir.

14   2007) (GAF score of 50 reflects serious limitations in individual's general ability to perform basic tasks of

15   daily life).  Further, "[a] GAF score of 31-40 is extremely low, and 'indicates . . . major impairment in

16   several areas, such as work or school, family relations, judgment, thinking, or mood.'" Salazar v. Barnhart,

17   468 F.3d 615, 624 n.4 (10th Cir. 2006) (quoting DSM-IV-TR at 32).

18          A GAF score also is "relevant evidence" of a claimant's ability to function mentally. England, 490

19   F.3d at 1023, n.8.  However, while a GAF score may be "of considerable help" to the ALJ, for example, in

20   assessing a claimant's residual functional capacity, "it is not essential" to the accuracy of that assessment.

21   Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002).  Thus, an ALJ's "failure

22   to reference the GAF score" in assessing a claimant's residual functional capacity, "standing alone" does

23   not make the residual functional capacity assessment inaccurate. Id.  In other words, the mere fact that a

24   low GAF score may have been assessed by a medical source is not in itself sufficient  to establish

25   disability.  Indeed, as discussed above, Dr. Stolzberg, despite originally assessing a GAF score of 31,

26   subsequently noted significant improvement in plaintiff's symptoms in less than a month's time.

27          That GAF score, and the other GAF scores assessed by Dr. Willett, also must be read in context of

28   the record as a whole.  For example, both he and Dr. Stolzberg treated plaintiff for only a limited period of

     time and shortly after he was released from the hospital.  In addition, while one examining psychologist in

REPORT AND RECOMMENDATION

the record later also assessed plaintiff with a low GAF score and found him incapable of returning to the work force (Tr. 514-25), thereby lending support to a finding of disability, both an examining psychiatrist and a non-examining psychologist found him to be much less limited in terms of his mental functioning and consequent ability to work (Tr. 217-39, 243-56, 259-62).

Plaintiff also argues both Dr. Willett and Dr. Stolzberg were aware of his substance abuse issues, implying that this was not a valid basis for rejecting or discounting their findings. It is not clear, however, either of them were aware of the nature and extent of plaintiff's history in this regard, or the conflicting statements with respect thereto he has made to those who have evaluated and treated him. For example, plaintiff told Dr. Willett on March 25, 2003, that he was "arrested for driving while intoxicated 2½ years ago," and that "[a]t one time, he drank up to a 12 pack of beer at a time." Tr. 207. He further told Dr. Willett that since his arrest, he had "cut back his alcohol intake quite a bit," and now drank "approximately three beers, twice a week." Id. In addition, plaintiff told Dr. Willett that although he had "used marijuana in the past," he had not done so recently. Id.

Just prior to his admission to the hospital, however, plaintiff reported that he had taken "two puffs of marijuana approximately two nights ago." Tr. 344. He later told Dr. Stolzberg he had "used marijuana in high school," implying no subsequent use thereof. Tr. 173. It is true that Dr. Stolzberg appears to have been more aware of plaintiff's substance abuse than Dr. Willett. For example, Dr. Stolzberg contrasted plaintiff's denial of "recent use of marijuana" to his earlier report of having smoked it just prior to his hospitalization. Id. The same appears to have been true with respect to plaintiff's alcohol use, with Dr. Stolzberg commenting that he "minimizes his drinking." Id. As noted above, furthermore, Dr. Stolzberg diagnosed plaintiff with both alcohol abuse and cannabis use, noting in particular that drinking increases the risk of suicide and strongly urging him to "absolutely stop drinking." Tr. 175.

At least with respect to this last statement by Dr. Stolzberg, however, plaintiff's assertion that Dr. Stolzberg did not diagnose any substance-induced psychiatric condition carries much less weight. While Dr. Stolzberg did not actually opine that plaintiff's alcohol abuse and cannabis use had caused plaintiff's other conditions, clearly he felt the former had some impact on his mental stability. In addition, although Dr. Stolzberg did appear to be more aware of plaintiff's substance use issues than did Dr. Willett, it still is unclear the extent of Dr. Stolzberg's knowledge thereof. Other evidence in the record shows plaintiff was

far less candid regarding his substance use than he now claims to have been.  For example, on the day of his hospitalization in early March 2003, plaintiff gave a negative history for "ETOH use" (Tr. 168), clearly in contrast to his later statements to Drs. Willett and Stolzberg.

At the time of his hospitalization, plaintiff reported that he had been "drinking a couple of drinks a couple of times a week," but that "recently" he was "drinking about two/three beers daily" for the purpose of self-medication. Tr. 163.  In mid-April 2003, however, he told another treatment provider that he drank "a 6-pack of beer every day before his hospitalization," and that now he was "down to 1 to 2 beers two to three times a week." Tr. 177.  Plaintiff was told to cut "back further on his alcohol." Id.  In early May 2003, plaintiff reported drinking "about two glasses of beer per month," and "two or three beers per month" prior to being started on medication. Tr. 224.  These statements are in contrast to the earlier ones he made to Dr. Willett and at the time of his hospitalization.

The record also indicates that in early May 2003, plaintiff appeared to have minimized the amount of alcohol he drank during the period of time prior to his arrest for driving under the influence ["DUI"] in May 2000 as well. Id.  Once more, he denied "any marijuana usage except for some experimentation in high school." Id.  This time, plaintiff  was diagnosed with "[a]lcohol and cannabis abuse disorder or dependence disorder, chronic, current status unknown," and possible "[a]lcohol and/or cannabis-related anxiety," further contradicting plaintiff's claim that no medical source in the record has diagnosed him with a substance-induced psychiatric disorders. Tr. 236; see also Tr. 324.  One non-examining psychologist found at least the first diagnose to be "quite viable" as well, agreeing, in addition, with the inconsistencies pointed out in plaintiff's reported history. Tr. 258.

In late June, 2003, plaintiff reported "a past period of heavy drinking," again claiming to drink only "one to two beers once a month" currently and having tried marijuana only as a teenager. Tr. 302.  Despite his previous report to the contrary, plaintiff denied "using alcohol to manage his symptoms" in early July 2003. Tr. 286.  He further admitted having "a few beers occasionally, perhaps three beers every couple of weeks when" getting together with friends. Id.  Plaintiff stated that while "[a]lcohol used to be a problem for him," he had "significantly cut back on his alcohol consumption." Id.  Given the inconsistencies in his prior reports, however, it would not have been unreasonable for the ALJ to find this statement difficult to verify or take at face value.

Plaintiff's mother did report in early October 2003, that alcohol did not seem to be a problem for him. Tr. 285.  In early June 2004, however, plaintiff was admitted to the hospital with acute pancreatitis, with "recent increased alcohol ingestion," and alcohol being "the most likely etiology." Tr. 327.  Although plaintiff reported drinking " approximately 2 beers per week," he did admit to "increased alcohol intake" during a camping trip the weekend immediately prior to his hospitalization. Tr. 322, 326, 329.  He also denied the use of any "street drugs, except for experimenting with marijuana in high school." Tr. 323, 327.

While hospitalized, plaintiff "began to withdraw from alcohol," during which time both his mother and girlfriend "explained the degree of alcohol disease which" he "had in which he was in great denial and only admitting to drinking a couple of beers per week." Tr. 509.  His girlfriend further "gave a history of" him "on a regular basis consuming at least a 6-pack per day of alcohol and the weekend prior to admission on a binge of nonstop alcohol intake from morning until night." Tr. 510.  These reports are in contrast to plaintiff's own denial of "recent heavy drinking" for the reason that he took pain maintenance medication. Tr. 323.  Plaintiff's family, including his girlfriend, also "noted a recent global decline in his functioning with recent increased alcohol and marijuana use," again contrary to plaintiff's prior denial regarding drug use, though this decline was felt "likely secondary to psychiatric decompensation." Tr. 510.  Nevertheless, plaintiff provisionally was diagnosed with "[a]lcohol abuse/dependence." Tr. 324.

In early January 2005, plaintiff reported sometimes cutting "down his medication in order to drink," because he realized he was "not supposed to drink on the medication." Tr. 505.  He reported "using alcohol two days in the last 30" days, with "[h]is last reported use of alcohol" being on New Years and Christmas. Id.  Despite earlier repeated denials of use of marijuana since high school, plaintiff also stated that he used marijuana "one time in the last 30" days as well, with his overall use of that drug amounting to "once in a blue moon." Id.  In early February 2005, plaintiff again reported that he sometimes did "cut back on his medications so that he" could drink, realizing he could not do both at the same time. Tr. 502.  The same level and frequency of alcohol and marijuana use by plaintiff as had been reported in early January 2003, was noted as well. Id.

In mid-March 2005, plaintiff reported no alcohol intake and denied "using alcohol to manage his symptoms." Tr. 500, 515.  Plaintiff also claimed that he had "not drunk" since he was hospitalized in early June 2004, for pancreatitis, although he did state that he drank "when a relative came back from Iraq in

1   February." Tr. 517.  This despite clear evidence in the record, including plaintiff's own prior self-report in

2   early January 2005, that he also had drunk on Christmas and New Years, and that he had continued to use

3   alcohol at the rate of two days every 30 days.  Plaintiff further reported that he had "stopped drinking after

4   his "first" DUI in May 2000, and that he was "unaware of how the pancreatitis" he was diagnosed with in

5   early June 2004, had developed, and whether this was "related to alcohol." Tr. 524.

6        Although plaintiff again denied recent drug and alcohol use in early May 2005 (Tr. 537), alcohol

7   use was suspected during a visit to the emergency room on September 14, 2005 (Tr. 557-58), in which he

8   had an "unsteady gait" and reported drinking "1 beer" that day (Tr. 554).  The following day, plaintiff was

9   found to have a "[h]istory of alcohol abuse, currently in remission with the exception of one beer last

10  night," although it was further noted that he had experienced other "occasional relapses." Tr. 542, 544.

11  Plaintiff also was diagnosed with "[r]ecent cannabis abuse," with plaintiff reporting having tried marijuana

12  "only once, that being recently for management of chronic pain." Id.

13       This last statement clearly conflicts with plaintiff's earlier statements to the contrary.  Although he

14  had a "zero" blood alcohol measurement, plaintiff's "[u]rine drug screen" came back "positive" for both

15  "cannabinoids and opiates," despite his denial of recent use of "illicit drugs." Tr. 545, 563.  Plaintiff

16  further reported at the same time having "used marijauna four weeks ago for pain," stating, however, that

17  he "just had one puff." Tr. 549-50.  Despite the admission that he drank one beer the night before, he

18  stated that he had "quit drinking alcohol" one year ago, though he also reported not having drunk "heavily

19  in the last year." Tr. 549-50, 563.  In addition, plaintiff reported that "once in a while he would do a beer

20  or so," but knew he was "not supposed to mix medications and alcohol together." Tr. 549-50.

21       The above history of plaintiff's alcohol and drug use, his inconsistent statements with respect to the

22  nature and extent of such use, and the diagnoses from various medical sources in the record of alcohol and

23  other substance abuse and/or dependence, certainly indicates that these issues may have had a much

24  greater impact on plaintiff's functioning than is being claimed here, and that the ALJ was not necessarily

25  remiss in so finding.  Nevertheless, as explained above, the ALJ failed to conduct an individual analysis of

26  either Dr. Willett's or Dr. Stolzberg's findings, which constituted legal error.  Remand to the

27  Commissioner for re-consideration of those findings, therefore, is appropriate.

28       For the same reason, this matter should be remanded to re-consider the opinions of Dr. Shahram

Hosseinion, M.D., who treated plaintiff while he was hospitalized for his acute pancreatitis in early June 2004, and Dr. D. Hoskins, who did the same with respect to plaintiff's visit to the emergency room in mid-September 2005.  As discussed above, in response to statements from plaintiff's family in early June 2004, that they had noted "a recent global decline in his functioning with recent alcohol and marijuana use," Dr. Hosseinion stated that "[t]his was determined to be likely secondary to psychiatric decompensation." Tr. 349, 510.  In mid-September 2005, mental health services progress notes indicate Dr. Hoskins had noted that plaintiff's behavior was "not attributable to opiod [sic] or pot abuse." Tr. 556.

As with Dr. Willett and Dr. Stolzberg, plaintiff argues the ALJ also failed to defer to the opinions of Drs. Hosseinion and Hoskins.  With respect to Dr. Hosseinion, it is true he found the reported recent global decline in functioning to be secondary to plaintiff's psychiatric decompensation, rather than to use of alcohol and marijuana.  Dr. Hosseinion, however, provided no opinion regarding plaintiff's ability to work, let alone what specific work-related mental functional limitations he had.  To the extent plaintiff is arguing the ALJ should have taken Dr. Hosseinion's statement as evidence that plaintiff's substance use has had no impact on his mental functioning, furthermore, as discussed above, there is a significant amount of other contrary medical evidence in the record.  Nevertheless, as the ALJ did not specifically address Dr. Hosseinion's findings, the undersigned cannot say whether he properly rejected them.

The same can be said in regard to the statement attributed to Dr. Hoskins.  As plaintiff himself has admitted, Dr. Hoskins provided no opinion or comment with respect to plaintiff's alcohol use, which the record clearly shows has continued, even though the exact nature and extent of such continued use may be in question.  Nor, like Dr. Hosseinion, did Dr. Hoskins provide any opinion on the issue of disability or on plaintiff's ability to perform work-related tasks.  Further, while Dr. Hoskins apparently did not feel opioid or cannabis abuse contributed to the behavior that led to plaintiff's emergency room visit in mid-September 2003, again, the record clearly shows use of such substances likely have been on-going.  As such, remand to re-consider the statement attributed to Dr. Hoskins in light of the other evidence in the record concerning plaintiff's drug use is appropriate here as well.

Lastly, plaintiff argues the ALJ failed to properly address the report and opinion of Jack M. Litman, Ph.D., who conducted a psychological evaluation in mid-March 2005.  Dr. Litman diagnosed plaintiff with a cognitive disorder, a psychotic disorder versus schizoaffective disorder bipolar type, and a

GAF score of 45 to 50, indicating "serious symptoms." Tr. 523.  He felt plaintiff's "cognitive problems" were likely due to the multiple head injuries plaintiff reported having suffered, to his "thought disturbance," and to the medication he had been prescribed. Tr. 524.  Specifically, Dr. Litman felt he likely would not be successful "in a high stress situation in which demands are being made of him to respond quickly and efficiently." Id.

Dr. Litman further believed that although plaintiff had "basic abilities to reason," his "flexibility in adjusting" was "poor" and he continued "to have an active thought disturbance despite" the intervention of psychotropic medication. Tr. 525.  Dr. Litman concluded that plaintiff did "not seem to be able to work at this time," a situation he felt was likely to continue while plaintiff's medications were stabilized. Tr. 524.  Dr. Litman went on to state that if plaintiff's "medical formulary" could be stabilized, and he could "gain some value from both individual and group psychotherapy," he had "the eventual potential of returning to the work force," which would take "around nine months to a year or more." Tr. 525.

As with the other medical opinion sources in the record discussed above, the ALJ does not mention Dr. Litman by name in his decision.  As noted above, though, the ALJ did find that:

> . . . The reported opinions that the claimant has recently been incapable of sustaining competitive work activity are at least partially supported by the record and are credited in my Finding No. 5.  However, the opinions are not credited with regard to the impact of the claimant's alcohol dependence and abuse on the instability of his other mental impairments and resulting functional limitations.

Tr. 22-23.  Also as noted above, Finding No. 5 reads in relevant part as follows:

> Due to pain and side-effects of medications, he is restricted to simple, one to three step, job tasks.  Due to chronic mild to moderate difficulties with social functioning, he is restricted to jobs involving no public interaction.  When abusing alcohol or marijuana, and when he is not compliant with the prescribed medical regimen due to substance abuse, the claimant experiences greater difficulties with social and cognitive functioning, and is unable to regularly attend work or sustain and complete work tasks throughout a full-time workday or workweek.

Tr. 21.

It is not clear the opinion of Dr. Litman was one of the opinions the ALJ was referring to here.  To the extent it was, however, the ALJ failed to state why he did not credit that opinion in light of the impact of plaintiff's alcohol dependence and abuse.  Nor do the mental functional limitations included in Finding No. 5 necessarily match up with those found by Dr. Litman.  For example, Dr. Litman made no functional findings as to plaintiff's ability to deal with the public.  The ALJ also failed to directly address the opinion

1  of Dr. Litman that plaintiff would be unable to work for up to a year or more.  On the other hand, contrary

2  to plaintiff's assertions, it does not appear he was completely honest regarding his alcohol use history (see

3  Tr. 515, 517-18, 524), which could have had at least some bearing on Dr. Litman's view of the causes of

4  plaintiff's mental impairments and limitations.  Accordingly, this evidence too should be re-considered on

5  remand to the Commissioner.

6       Plaintiff asserts the ALJ failed to provide any explanation for his conclusion that plaintiff was not

7  truthful regarding his alcohol and drug use history, pointing out that psychological testing performed by

8  Dr. Litman indicated the presence of some confabulation and confusion. Tr. 522.  There is no indication in

9  Dr. Litman's report, however, that such testing results adversely impacted plaintiff's ability to tell the truth

10 or report accurately regarding his past history.  Indeed, Dr. Litman made no such specific finding.  It was

11 just as or, rather, more reasonable, therefore, for the ALJ to find the inconsistencies in plaintiff's self-

12 reports to have been due to a lack of honesty on his part, rather than to any cognitive impairment.

13 II.    The ALJ's Step Two Analysis

14      At step two of the sequential disability evaluation process, the ALJ must determine if an

15 impairment is "severe."  Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's

16 mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c), §

17 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities

18 are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b), § 416.921(b); SSR

19 85- 28, 1985 WL 56856 *3.

20      An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

21 than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v.

22 Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff

23 has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic

24 work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d

25 599, 601 (9th Cir. 1998).  The step two inquiry described above, however, is a de minimis screening device

26 used to dispose of groundless claims.  Smolen, 80 F.3d at 1290.

27      As noted above, the ALJ found plaintiff to have severe impairments consisting of traumatic right

28 knee chondromalacia, asthma, a major depressive disorder, an anxiety disorder, alcohol dependence/abuse,

REPORT AND RECOMMENDATION
Page - 14

and marijuana abuse. Tr. 18.  Plaintiff argues the ALJ erred in failing to find his psychotic disorder and/or schizoaffective disorder and his cognitive disorder to be severe as well.  Specifically, plaintiff asserts the ALJ provided no explanation as to why he did not so find.  Those impairments, plaintiff further asserts, cause vocationally relevant limitations, and thus must be considered to be severe.  While the undersigned agrees the ALJ failed to conduct a proper step two evaluation in this regard, it is not clear that he would be required to find them to be severe here.  Accordingly, remand for this reason too is proper.

Most of the medical sources in the record who have evaluated plaintiff, did not diagnosed him with either a psychotic disorder and/or schizoaffective disorder or a cognitive disorder. See Tr. 162, 164, 168, 171-72, 175, 177, 183-85, 190-91, 207, 209, 213-14, 216, 235-36, 242, 246, 248, 295, 312, 340, 345, 417-18.  As noted above, however, Dr. Litman did diagnose plaintiff with a psychotic disorder versus schizoaffective disorder, as well as a cognitive disorder. Tr. 523.  Also as noted above, Dr. Litman assessed him with a GAF score of 45 to 50, indicating a serious impairment in occupational functioning or performance of basic tasks of daily life. Id.  More specifically, Dr. Litman found plaintiff would not likely be successful in a high stress situation that demanded him to respond quickly and efficiently, his flexibility in adjusting was poor, and he would not be able to work. Tr. 524-25.

Other mental health treatment providers in the record, though not all licensed psychiatrists or psychologists – and thus not "acceptable medical sources"[6] – also diagnosed plaintiff with a schizoaffective disorder or history thereof and/or psychosis. Tr. 320, 324, 500, 502, 504, 542, 551, 556, 563, 565.  Several of those providers diagnosed him with low GAF scores as well, ranging from 40 to 55. Tr. 320, 324, 502, 504, 563.  As such, there certainly was sufficient medical evidence in the record for the ALJ at least to have considered whether plaintiff's schizoaffective and/or psychotic disorder and his cognitive disorder constituted severe impairments.  The ALJ's failure to do so was improper.  However, given that the great majority of the acceptable and other medical sources in the record did not make those diagnoses, it is not clear that the ALJ was required to so find.  Thus, again remand is appropriate.

---

[6]See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996); 20 C.F.R. § 404.1513(a), (d), § 416.913(a), (d) (licensed physicians and licensed or certified psychologists are "acceptable medical sources").  The opinions of other medical sources, such as nurse practitioners, instead generally are treated in the same manner as testimony of lay witnesses. See 20 C.F.R. § 404.1513(d), § 416.913(d) (Commissioner may also use evidence from other sources to show the severity of claimant's impairment(s) and how those impairments affects his or her ability to work).

REPORT AND RECOMMENDATION
Page - 15

III.     The ALJ's Step Three Analysis Was Proper

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 404.1520(d), § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id.  The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. Tacket, 180 F.3d at 1098.

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508, § 416.908.  It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id.  An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.  An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id. at *2.  However, "symptoms alone" will not justify a finding of equivalence. Id.

At step three, the ALJ found that none of plaintiff's mental impairments met or equaled the criteria of any of those in the Listings. Tr. 20.  In particular, the ALJ considered Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders). Tr. 20-21.  Plaintiff argues that while the ALJ recited the criteria of those two Listings, he failed to engage in a function-by-function analysis of his limitations and how those limitations applied to the Listings.  Plaintiff further argues the ALJ completely failed to evaluate whether his psychotic disorder met or equaled the criteria in Listing 12.03 (schizophrenic, paranoid and other psychotic disorders).  It is true that an ALJ must evaluate all of "the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment." Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001).  Thus, a mere "boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." Id.

The ALJ, however, is not required to "state why a claimant failed to satisfy every different section of the listing of impairments." Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (finding ALJ did

1  not err in failing to state what evidence supported conclusion that, or discuss why, claimant's impairments

2  did not meet or exceed Listings). This is particularly true where the claimant has not set forth any reasons

3  as to why the Listing criteria have been met or equaled. Lewis, 236 F.3d at 514 (finding failure to discuss

4  combined effect of claimant's impairments was not error, noting claimant offered no theory as to how, or

5  point to any evidence to show, his impairments combined to equal a listed impairment).

6      Such is the case here, as plaintiff has cited to no evidence in the record in support of his argument.

7  No medical source in the record has opined that plaintiff's impairments, alone or in combination, meet or

8  equal any of the criteria in Listing 12.03, 12.04 or 12.06. Indeed, the only medical source to have provided

9  any opinion concerning the Listings specifically found that the criteria for Listings 12.04 and 12.06 were

10  not present. Tr. 253-54. Nor does a review of the medical evidence in the record show the criteria Listings

11  12.03, 12.04 or 12.06 have been met or equaled.[7]

12  IV.    The ALJ Properly Assessed Plaintiff's Credibility

13      Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d

14  639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749

---

16  [7]Listing 12.03, for example, requires: ". . . at least two of the following . . . Marked restriction of activities of daily living;
17  or . . . Marked difficulties in maintaining social functioning; or . . . Marked difficulties in maintaining concentration, persistence,
   or pace; or . . . Repeated episodes of decompensation, each of extended duration; Or . . . Medically documented history of a chronic
18  schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of
   ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of
   the following: . . . Repeated episodes of decompensation, each of extended duration; or . . . A residual disease process that has
19  resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be
   predicted to cause the individual to decompensate; or . . . Current history of 1 or more years' inability to function outside a highly
20  supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App.
   1, § 12.03B and C.
21      Similarly, Listing 12.04 requires: ". . . at least two of the following . . . Marked restriction of activities of daily living; or
   . . . Marked difficulties in maintaining social functioning; or . . . Marked difficulties in maintaining concentration, persistence, or
22  pace; or . . . Repeated episodes of decompensation, each of extended duration; Or . . . Medically documented history of a chronic
   affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities,
23  with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: . . . Repeated episodes
   of decompensation, each of extended duration; or . . . A residual disease process that has resulted in such marginal adjustment that
24  even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to
   decompensate; or . . . Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with
25  an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04B and C.
       Listing 12.06, in turn, also requires: ". . . at least two of the following . . . Marked restriction of activities of daily living;
26  or . . . Marked difficulties in maintaining social functioning; or . . . Marked difficulties in maintaining concentration, persistence,
   or pace; or . . . Repeated episodes of decompensation, each of extended duration. Or . . . complete inability to function independently
27  outside the area of one's home." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06B and C. Although it is clear, as the ALJ found, that
   plaintiff does indeed have at least some functional limitations stemming from his mental impairments, there is no evidence those
28  limitations meet or equal the criteria for any of the above Listings.

F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints."  Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms.  Id.

With respect to plaintiff's credibility, the ALJ found in relevant part as follows:

> I have found the claimant's statements concerning his impairments and their impact on his ability to work not fully credible.  He has lied and continues to lie about his alcohol dependence and abuse.  He has attempted (sometimes successfully) to conceal his alcohol dependence and the extent of his continuing abuse from examining doctors and treatment sources.  He has denied his dependence and heavy abuse despite medical evidence of withdrawal and statement [sic] of others that reveal heavy abuse.  The medical evidence reveals he has simple [sic] lied about his continuing alcohol abuse.  He testified he had not consumed alcohol during the year prior to the hearing, contrary to medical reports that reveal he acknowledged alcohol use as recently as the latest medical reports of record, in September 2005. . . .

Tr. 21-22.  Plaintiff asserts the ALJ has "concocted a rationale" that "depends upon scattered bits of history spanning 25 years to support his premise" that he lied about his substance use. (Dkt. #23, p. 18). However, as discussed above, there is ample evidence in the record indicating plaintiff, at the very least, has not been very forthright about the nature and extent of his alcohol use.  While the language the ALJ used to describe the inconsistencies in plaintiff's reported history may have been fairly strong, that does

REPORT AND RECOMMENDATION
Page - 18

1  not mean the ALJ's findings on this issue were incorrect, and the undersigned no error here.

2       In his attempt to challenge the ALJ's above findings, plaintiff first asserts there is no evidence in

3  the record to refute his testimony at the hearing that he was not a heavy drinker overall during the time he

4  was in the military in the early 1980's, which ended when he received an "other than honorable discharge"

5  for having assaulted his captain after he had been drinking. Tr. 19, 601. The ALJ, however, did not rely

6  solely on that period of time to discount plaintiff's credibility. Plaintiff's assertion regarding the lack of

7  evidence in the record, furthermore, is not entirely true. For example, while plaintiff initially told Dr.

8  Litman that he "was never a heavy drinker," he admitted he "drank a bit more in the military at three to

9  four beers three times a week." Tr. 518. He further "stated that he had more fights after he was released

10 from the Army," at least some of which "involved drinking." Id.

11      Plaintiff admits the DUI he received in 2000, is a factor to be considered in assessing his

12 credibility, but argues it alone does not establish a life-long pattern of heavy drinking. Again, this

13 characterization of the evidence in the record, and the ALJ's treatment thereof, is off the mark. First, the

14 ALJ did not entirely rely on the DUI in questioning the truthfulness of plaintiff's alcohol use history.

15 Second, once more as discussed above, the record contains, and the ALJ pointed to, a much more recent

16 and lengthy history of alcohol use, and inconsistencies in the reporting thereof, indicating the presence of a

17 more significant and long-standing problem than is being claimed by plaintiff.

18      Next, plaintiff points to what he claims to have been consistent employment during the years 1976-

19 2000, 2002 and 2003. Even accepting plaintiff's description of his employment during that period as true,

20 this fact has only a distant bearing on the issue of plaintiff's truthfulness regarding his alcohol use history.

21 First, it is entirely possible that an individual may have a regular and consistent employment history, and

22 yet continue to drink and/or abuse alcohol. Not every such individual evinces an inability to maintain a

23 job or steady work. Second, plaintiff's employment history does nothing to counter what certainly appear

24 to be highly inconsistent reports regarding the nature and extent of his use of alcohol that he has given to

25 various medical sources in the record. That is, a history of maintaining consistent employment is not

26 necessarily incompatible with a history of making inconsistent statements to others.

27      Plaintiff also argues his mother and girlfriend have ratified his claims that he normally does not

28 drink excessively. However, plaintiff cites to no specific portion in the record showing statements to this

REPORT AND RECOMMENDATION
Page - 19

1    effect actually have been made by them.  It was reported in early October 2003, that drugs and alcohol did

2    "not seem to be a problem in [plaintiff's] mother's view." Tr. 285.  As discussed above, though, this report

3    is directly contradicted by other statements made by plaintiff's girlfriend and family.  In early June 2004,

4    for example, his girlfriend reported a history of him consuming "on a regular basis" at least "a 6-pack per

5    day of alcohol," and having gone "on a binge of nonstop alcohol intake from morning until night" during

6    the weekend immediately prior to his admission to the hospital. Tr. 510.  Plaintiff's family, including his

7    girlfriend, also reported at the time "a recent global decline in his functioning with recent increased

8    alcohol intake."[8] Id.

9         It is true, as plaintiff states, that the mental health case manager who worked with him during 2005,

10   reported no evidence of drug or alcohol use in his home or on his person.  However, the hearing testimony

11   makes clear that the case manager, whose testimony is dealt with in greater detail below, was completely

12   unaware of plaintiff's drug and alcohol history, including reports made by plaintiff to other medical

13   sources during the same time period. Tr. 626-27, 630-31.  Given this, and all of the other evidence in the

14   record regarding plaintiff's history of alcohol use, and inconsistent reports made by him with respect

15   thereto, the assertion that "[t]wo alcohol related incidents 20 years apart do not establish a trend" is

16   without merit (Dkt. #23, p. 19), and is insufficient to rebut the ALJ's credibility findings here.

17       Plaintiff asserts he has consistently reported drinking only a few beers a few times a week up to

18   about one-year prior to the hearing, when he, his mother and his girlfriend reported that it had pretty much

19   stopped.  This assertion simply is not true.  First, plaintiff cites to no portion of the record showing that his

20   mother or girlfriend made the reports he attributes to them.  Again, the only report in the record that comes

21   close to this is one attributed to his mother in early October 2003 – more than two years prior to the

22   hearing – in which it is stated that alcohol did not seem to be a "problem" for him at the time.  Further,

23   plaintiff, as discussed above, appeared to have continued drinking at least through mid-September 2005,

24   when he came to the emergency room stating he had consumed only "1 beer" that day, but it being

25   reported by those who treated him that he was exhibiting an unsteady gait. Tr. 554.

26   _____

27       [8]The fact that Dr. Hosseinion may have suspected plaintiff's recent global decline in functioning to have been more likely
     secondary to his psychiatric decompensation, does not take away from the fact that both plaintiff's mother and girlfriend reported

28   a history of heavy alcohol use.  Hospital treatment notes from early June 2004, furthermore, make specific reference to plaintiff's
     beginning to "withdraw from alcohol," along with associated alcohol withdrawal symptoms (Tr. 509), lending further credence to
     the ALJ's finding of alcohol dependence and continued abuse.

Second, and more significantly, as outlined above, plaintiff has not consistently reported drinking only a few beers a few times a week.  For example, while plaintiff told Dr. Willett on March 25, 2003, that he drank "approximately three beers, twice a week," and had at one point consumed "up to a 12-pack of beer at a time," three weeks earlier on admission to the hospital, he reported a negative history for "ETOH use." Tr. 168, 207.  Plaintiff further reported both "drinking a couple of glasses a couple of times a week," and "recently" drinking "about two/three beers daily." Tr. 163.  Less than two months later, furthermore, plaintiff reported having consumed "a 6-pack of beer every day" prior to his hospitalization, though he now claimed to be down to only "1 to 2 beers two to three times a week." Tr. 177.

Plaintiff's reported level of alcohol intake continued to change.  In early May 2003, he reported that he drank "about two glasses of beer per month," and "two or three beers per month" prior to being started on medication. Tr. 224.  In late June 2003, he reported drinking "one to two beers once a month" (Tr. 302), as well as having "a few beers occasionally, perhaps three beers every couple of weeks" (Tr. 286).  Again, the reports of plaintiff's excessive drinking during the period leading up to his hospitalization in early June 2004, further contradicts his assertion that he has been consistent in reporting drinking only a few beers a few times a week.  In both early January and early February 2005, plaintiff reported drinking two days in the last 30 days (Tr. 502, 505), further reporting that he sometimes cut back on medications so he could drink (Tr. 502).  In mid-March 2005, he reported he had "not drunk" since his hospitalization in early June 2004. Tr. 517.  While these last reports indicate consumption of alcohol at a lower level, they do underscore plaintiff's lack of consistency regarding the nature and extent of his drinking.

Plaintiff further argues that on occasion, his treatment providers have stated that he was in denial regarding how much he drank.  Such denial, plaintiff asserts, is a coping mechanism, which implicates a psychological function, rather than a conscious distortion of truth.  In addition, he points to psychological testing results indicating the presence of some confabulation on his part, which he claims is fundamentally distinguishable from lying.  Thus, plaintiff states, given his complex psychology, concluding that he has lied about his alcohol use history is not convincing.  None of the medical sources in the record, however, have opined that plaintiff's mental impairments have caused him to be inconsistent in his self-reports or otherwise incapable of being untruthful.

1    In essence, plaintiff here is attempting to substitute his interpretation of the evidence in the record

2    for that of the ALJ.  The ALJ, however, is responsible for determining credibility and resolving

3    ambiguities and conflicts in the medical evidence.  Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642.  In

4    such cases, "the ALJ's conclusion must be upheld."  Morgan, 169 F.3d at 601.  Further, even to the extent

5    the record is not entirely clear as to the extent the inconsistencies in plaintiff's self-reports are due to

6    untruthfulness or to a psychological impairment, the ALJ's credibility determination may not be reversed

7    where it is based on contradictory or ambiguous evidence.  See Allen, 749 F.2d at 579.  Accordingly,

8    plaintiff has not come forth with convincing reasons to challenge the ALJ's credibility determination here,

9    and the undersigned, therefore, will not overturn it.

10    In addition, the ALJ found plaintiff has provided inconsistent statements concerning other matters

11    as well.  With respect to those matters, the ALJ found in relevant part as follows:

12        . . . He has also given inconsistent statement [sic] about the existence or severity of
         ongoing audio or visual hallucinations.  He has continued to complain of the symptoms,
13        but acknowledged at the hearing he doe [sic] not have severe psychotic symptoms
         when compliant with prescribed medications.  Contrary to his denial owing child
14        support, the medical reports reveal he owed back child support in 2003. . . .

15    Tr. 22.  Plaintiff has not challenged the ALJ's findings here, and the undersigned finds them to be a valid

16    basis for discounting his credibility.  See Smolen, 80 F.3d at 1284 (ALJ may consider ordinary techniques

17    of credibility evaluation, such as prior inconsistent statements concerning symptoms and other testimony

18    that appears less than candid).

19    Lastly, the ALJ discounted plaintiff's credibility in relevant part for the following reason:

20        . . . The treatment records also reveal evidence of symptoms exaggeration and likely
         malingering behind some of his complaints.  He has been observed to move with a
21        "normal," "ambling" gait when distracted, while exhibiting a different, "shuffling and
         hesitant," walk during the examination. . . .

22
23    Tr. 22.  One medical source in the record, Eugene E. Klecan, III, M.D., described plaintiff as most

24    probably having "a theatrically enacted, embellished if not wholly factitious disorder," including

     "conscious, goal-directed magnification."  Tr. 233-34.  Dr. Klecan further commented that he could not

25    "reasonably account" for plaintiff's mental state, "except with a diagnosis of theatrical psychodrama,

26    meaning a purposefully and flagrantly enacted role," or, in other words, malingering. Tr. 234-35.  He also

27    found plaintiff's claims to be "grossly implausible," and to "have all arisen . . . in a context of major

28    secondary gains."  Tr. 234.  It seems the ALJ relied on these findings in setting forth the above asserted

REPORT AND RECOMMENDATION
Page - 22

1 reason.

2   As plaintiff points out, those findings were called into question by Frank Lahman, Ph.D., a non-

3 examining psychologist. Tr. 258-59. Plaintiff thus argues Dr. Klecan's "unprofessional diatribe" should

4 not impact the ALJ's credibility determination, and, accordingly, cannot be considered to be evidence of

5 malingering. (Dkt. #23, p. 18). Although Dr. Lahman is a non-examining pscyhologist, and therefore his

6 opinion is entitled to less weight than that of Dr. Klecan, no other medical source in the record has opined

7 that plaintiff is malingering. Lester, 81 F.3d at 830-31 (non-examining physician's opinion may constitute

8 substantial evidence if consistent with other independent evidence record); Tonapetyan, 242 F.3d at 1149.

9 Indeed, two other examining medical sources expressly found no evidence of any malingering or attempts

10 on plaintiff's part to "look impaired." Tr. 156, 522.

11   For these reasons, the undersigned finds an insufficient basis in the record to establish a finding of

12 malingering in this case. Nor do Dr. Klecan's findings otherwise appear to be a valid basis for calling into

13 question plaintiff's credibility otherwise, as no other medical source in the record has concluded as he has

14 regarding plaintiff's mental impairments and functional limitations, other than with respect to his alcohol

15 and drug use. Nevertheless, the fact that one of the asserted reasons for discounting plaintiff's credibility

16 was improper, does not render the ALJ's credibility determination invalid, as long as that determination is

17 supported by substantial evidence in the record, as it is in this case. Tonapetyan, 242 F.3d at 1148.

18 V.   The ALJ's Evaluating of the Lay Witness Statements in the Record

19   Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

20 account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

21 each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001). An ALJ may discount lay

22 testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

23 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence). In

24 rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons"

25 for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to

26 those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512. The ALJ

27 also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

28   Plaintiff argues the ALJ improperly rejected the testimony of Anthony Decorte, his mental health

case manager.  With respect to Mr. Decorte's testimony, the ALJ found as follows:

> I have also considered the testimony of the claimant's psychiatric social worker,
> Anthony Decorte, who has a bachelor's degree in psychology.  Mr. Decorte said he has
> helped the claimant with shopping and with life skills.  He has missed a number of
> appointments, and Mr. Decorte calls to remind him.  He seems to be doing better but
> continues to have anxiety and paranoia.  His mental stability mostly depends on
> whether he remembers to take his medications.  When asked about the affect of
> continuing alcohol abuse on the claimant's mental stability and the evidence of his
> alcohol abuse, Mr. Decorte stated he had "no knowledge of any of this."  Because the
> witness is unaware of the claimant's alcohol dependence, I give his testimony little
> weight.  Mr. Miles has lied to the witness, and Mr. Decorte is unqualified to critically
> assess the veracity of the claimant's subjective complaints or the effects of alcohol
> dependence/abuse on his mental stability and functioning.

Tr. 22.  Plaintiff asserts the ALJ gave no specific reason for rejecting Mr. Decorte's testimony, but the ALJ

need only give an "arguably germane" reason for doing so, which the ALJ did here.

It is not clear from the record that plaintiff actually lied to Mr. Decortes regarding his use of

alcohol and/or history thereof, at least in the form of express false statements.  Mr. Decorte's admitted

complete lack of knowledge concerning such use and history, however, does call into question the

accuracy of his testimony.  That is, it certainly was reasonable for the ALJ to question whether Mr.

Decortes would have come to the same conclusions regarding plaintiff's functioning had he been aware of

the extent and nature of plaintiff's history and prior inconsistent statements with respect thereto.  The ALJ,

though, failed to pose any questions to Mr. Decortes in this regard, which might have answered his

concerns about Mr. Decorte's testimony.  Accordingly, as this matter is being remanded in any event, the

Commissioner shall re-contact, or obtain further testimony from, Mr. Decortes for this purpose.

VI.     The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of

the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

claimant's residual functional capacity assessment is used at step four to determine whether he or she can

do his or her past relevant work, and at step five to determine whether he or she can do other work.  Id.  It

thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to

perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only

those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

The ALJ assessed plaintiff with the following physical residual functional capacity:

> . . . He is able to lift and carry up to 30 pounds occasionally and 20 pounds frequently. He is able to stand or walk six hours total in an eight hour workday.  However, he is unable to walk longer than one-half hour at a time and can stand no longer than one hour at a time without an opportunity to shift weight and stretch.  He can occasionally bend, crawl, or climb.  Due to asthma, he must avoid concentrated exposure to dust, gases, or smoke. . . .

Tr. 21, 24.  Plaintiff asserts the ALJ failed to include in the above assessment any limitations with respect to kneeling, crawling, stooping, crouching, squatting, or climbing.  As support for that assertion, plaintiff points to a late February 2000 examination conducted by Stephen Fuller, M.D., who found him to be significantly limited in his ability to repetitively use his right knee. Tr. 144.  Specifically, Dr. Fuller opined that plaintiff was "partially limited from repetitively using the right knee . . . in activities such as ladder climbing, crawling, or repetitive squatting." Id.

As can be seen above, the ALJ did find plaintiff was limited to occasional crawling and climbing.  The undersigned finds this finding adequately incorporates the repetitive limitations found by Dr. Fuller with respect to those activities.  Despite Dr. Fuller's limitation on repetitive squatting, the ALJ included no limitation on that activity, even though Dr. Fuller is the only medical source in the record to offer an opinion concerning plaintiff's physical limitations.  The ALJ's failure to include this limitation in his assessment of plaintiff's residual functional capacity was error.  However, neither Dr. Fuller nor any other medical source in the record found any express limitations in plaintiff's ability to kneel or stoop, although arguably Dr. Fuller did so by implication  with respect to crouching, as that activity may be sufficiently similar to the ability to squat.  Indeed, the fact that Dr. Fuller specifically listed ladder climbing, crawling and repetitive squatting as the activities in which he found plaintiff to be limited, strongly indicates he did not believe problems with the right knee resulted in any further limitations.

The undersigned, therefore, finds the ALJ did not err in not including such limitations in plaintiff's residual functional capacity assessment.  Plaintiff points to Dr. Fuller's finding that he had a moderate ligamentous injury causing a lax knee. Tr. 144.  "The mere existence of an impairment," however, is itself

1  "insufficient proof of a disability" Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993).  Rather, plaintiff

2  must point to actually functional limitations stemming from his impairments.  As discussed above, Dr.

3  Fuller set forth those limitations – no repetitive ladder climbing, crawling or squatting – in his report, and

4  the medical evidence in the record supports no additional ones.  Plaintiff also states he complained of pain,

5  difficulty running, squatting, bending, pivoting, and playing sports.  The ALJ, though, properly discounted

6  his credibility, and thus was not required to adopt these other limitations.  Even so, the ALJ did find him to

7  be limited to occasional bending, although he was not required to do so.

8      In addition, plaintiff states that he submitted evidence to the Appeals Council establishing he has

9  bilateral avascular necrosis and needs a hip replacement.  This condition, plaintiff asserts, would create a

10  significant impact on his residual functional capacity.  While the mere fact that plaintiff has been

11  diagnosed with a particular impairment and may need a hip replacement in the future does not in itself

12  establish the presence of disability or significant limitations stemming therefrom, the medical source who

13  examined and diagnosed plaintiff at the time, did tell him to "start using a walker and possibly a

14  wheelchair to restrict his activities with his hip." Tr. 584.  Nevertheless, because the ALJ has not had an

15  opportunity to address that evidence, and he cannot be faulted for not doing so.  However, given that this

16  matter is being remanded for  further consideration of the medical evidence in the record for other reasons,

17  on remand the Commissioner shall consider this additional evidence as well.

18      Plaintiff further argues the ALJ failed to include in the above residual functional capacity

19  assessment all of the mental functional limitations identified by Drs. Litman, Stolzberg and Willett, as well

20  as the other treating medical sources in the record.  As discussed above, the ALJ erred in evaluating the

21  opinions of Dr. Litman, Dr. Stolzberg and Dr. Willett, by failing to provide reasons for rejecting those

22  opinions specific to each medical source.  Also as discussed above, the undersigned found the ALJ was not

23  necessarily required to adopt their opinions, as it was unclear the extent to which they were aware of the

24  nature and extent of plaintiff's alcohol use and history.  For that reason, it too is unclear whether the ALJ

25  was required to include in plaintiff's mental residual functional capacity assessment any of the limitations

26  they found.  As such, the undersigned finds remand for further consideration of this issue proper.

27  VII.    The ALJ's Materiality Findings Concerning Plaintiff's Substance Abuse

28      A claimant may not be found disabled if alcoholism or drug addiction would be "a contributing

factor material to the Commissioner's determination" that the claimant is disabled. Bustamante v.

1   Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).

2   Similarly, the Social Security Regulations also require that the Commissioner determine whether "drug

3   addiction or alcoholism is a contributing factor material to the determination of disability." Id. (citing 20

4   C.F.R. § 404.1535(a), § 416.935(a)).

5        To determine whether a claimant's alcoholism or drug addiction is a materially contributing factor,

6   the ALJ first must conduct the five-step disability evaluation process "without separating out the impact of

7   alcoholism or drug addiction." Id. at 955.  If the ALJ finds the claimant is not disabled, "then the claimant

8   is not entitled to benefits." Id.  If the claimant is found disabled "and there is 'medical evidence of [his or

9   her] drug addiction or alcoholism,'" the ALJ proceeds "to determine if the claimant 'would still [be found]

10   disabled if [he or she] stopped using alcohol or drugs.'" Id. (citing 20 C.F.R. § 404.1535, § 416.935).

11   Thus, if a claimant's current limitations "would remain once he [or she] stopped using drugs and alcohol,"

12   and those limitations are disabling, "then drug addiction or alcoholism is not material to the disability, and

13   the claimant will be deemed disabled." Ball v. Massanari, 254 F.3d 817, 821 (9th Cir. 2001).

14        Plaintiff argues the ALJ has blurred the distinction between materiality and credibility with respect

15   to the issue of the presence of alcohol and drug abuse in this case.  In essence, plaintiff is arguing that his

16   alcohol and drug use are not material to the determination of disability here.  In support of this argument,

17   plaintiff first asserts he was never diagnosed with "pot abuse," but only with occasional use thereof. (Dkt.

18   #23, p. 17).  While it is true that no medical source in the record has actually diagnosed plaintiff with drug

19   abuse, no such diagnosis is required in order to make a finding of materiality.  Rather, as discussed above,

20   the emphasis is on the use of drugs and alcohol.  Also as discussed above, although it is not clear exactly

21   how much marijuana plaintiff has used at any one time, the record does indicate the presence of continued

22   use over an extended period of time, which is relevant to the issue of materiality.

23        Plaintiff next argues that when he has been diagnosed with alcohol abuse or dependence, all of his

24   treating medical sources have opined that such abuse or dependence was not the cause of his mental health

25   symptoms.  This, however, is not an accurate description of the evidence in the record.  The only medical

26   source in the record to have so opined, was Dr. Hosseinion, who, in response to comments from plaintiff's

27   family regarding a recent global decline in functioning with increase alcohol intake, suspected such decline

28   instead may have been secondary to his psychiatric decompensation. Tr. 349.  Further, as discussed above,

the record indicates that many, if not most, of plaintiff's treating and examining medical sources may not

1   have been fully aware of the nature and extent of alcohol use and history thereof.  As such, at this point the

2   record does not definitively show the extent to which plaintiff's use of alcohol may or may not have had an

3   impact on his ability to perform work-related functions.

4        Next, plaintiff asserts the medical sources in the record usually have concluded that his increased

5   use of substances were caused by a psychiatric decompensation.  Again, however, the only comment from

6   a medical source in the record to this effect comes from Dr. Hosseinien, who, it should be pointed out,

7   appears to have largely <u>suspected</u> plaintiff's decline at that time likely was secondary to his psychiatric

8   decompensation.  <u>See</u> Tr. 349, 510.  Lastly, plaintiff states he has suffered years of psychotic symptoms,

9   with multiple – although the record merely documents two – hospitalizations.  Plaintiff further states that

10  one of those hospitalizations, presumably that which occurred in early March 2003, demonstrated a lack of

11  evidence indicating the presence of drugs or alcohol.

12       Once more, though, the evidence in the record of on-going alcohol and drug use is ample, including

13  during the period both prior to and after the early March 2003 hospitalization.  Plaintiff's early June 2004

14  hospitalization, furthermore, clearly was the direct result of excessive alcohol intake.  In addition, the mere

15  fact that plaintiff may have experienced mental health symptoms for a number of years, does not mean

16  such symptoms were not caused or influenced by his alcohol and/or drug use, especially when the

17  evidence in the record shows such use largely has continued over the same period of time.

18       Accordingly, contrary to plaintiff's assertion, he has not shown a lack of materiality in this case

19  regarding his alcohol and drug use.  Nevertheless, given the ALJ's errors in evaluating the medical and

20  other evidence in the record discussed above, and the questions surrounding the actual impact such use

21  may have had on plaintiff's mental functioning capabilities, it is premature to say that materiality has been

22  shown here.  As such, the undersigned finds that this matter should be remanded to the Commissioner for

23  further consideration of this issue as well.

24  VIII.   <u>This Matter Should Be Remanded for Further Administrative Proceedings</u>

25       The Court may remand this case "either for additional evidence and findings or to award benefits."

26  <u>Smolen</u>, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

27  except in rare circumstances, is to remand to the agency for additional investigation or explanation."

28  <u>Benecke v. Barnhart</u>, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

which it is clear from the record that the claimant is unable to perform gainful employment in the national

REPORT AND RECOMMENDATION
Page - 28

1   economy," that "remand for an immediate award of benefits is appropriate." Id.

2       Benefits may be awarded where "the record has been fully developed" and "further administrative

3   proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

4   1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

5       (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
        evidence, (2) there are no outstanding issues that must be resolved before a
6       determination of disability can be made, and (3) it is clear from the record that the ALJ
        would be required to find the claimant disabled were such evidence credited.

7   Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because

8   issues still remain with respect to the medical opinion source evidence and lay witness testimony in the

9   record, plaintiff's residual functional capacity, and the materiality of his alcohol and drug use, this matter

10  should be remanded to the Commissioner for further administrative proceedings.

11      Plaintiff argues that when his actual limitations are considered, he would not be able to perform

12  work which exists in significant numbers in the national economy.[9]  As discussed above, however, other

13  than with respect to the limitation of no repetitive squatting, it is not clear the ALJ was required to include

14  in his assessment of plaintiff's residual functional capacity any of the other limitations plaintiff argues he

15  should have included therein.  Nor has plaintiff made any showing that such limitations, even if adopted,

16  would have resulted in a finding of disability.  Accordingly, this is yet another issue the Commissioner on

17  remand should address.

18                                          CONCLUSION

19      Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

20  was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

21  further administrative proceedings in accordance with the findings contained herein.

22      Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

23  the parties shall have ten (10) days from service of this Report and Recommendation to file written

24  objections thereto.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

25  objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

26

27

28      [9]If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must
    show there are a significant number of jobs in the national economy the claimant is able to perform. Tackett v. Apfel, 180 F.3d 1094,
    1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational
    expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101;
    Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

REPORT AND RECOMMENDATION
Page - 29

1   imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **March 7, 2008**,

2   as noted in the caption.

3          DATED this 12th day of February, 2008.

5

6          Karen L. Strombom
           United States Magistrate Judge
7